Will the clerk please call the next case? 5-230-479-WC, Gilster-Mary Lee Corp. Appellant by Lyndon Wilms v. The Illinois Workers' Compensation Comm'n, Derek Lewis, son of Leonard Lewis, deceased, appellee, by Jason Coffey. Mr. Wilms, is that correct? Yes, Your Honor. You may proceed. Thank you. Thank you, Your Honor. Good morning. Mr. Wilms, what firm are you from? I'm with Firework Major Green and Ryan. The only reason why I asked the question is there was no lawyer on the brief. But go ahead. Thank you. Your Honor, I'm representing the appellant, Gilster-Mary Lee. I'd like to start with just a few of the facts as we get into this case, if you don't mind, that on August 3rd, 2012, Leonard Lewis was an employee of Gilster-Mary Lee. His job was as a lead person to go around and do repairs and maintenance on the equipment at Gilster-Mary Lee, a private food manufacturer. On that day, for some reason, he went to an area that's not covered by security cameras or any kind of surveillance systems, and he went to a marshmallow dehydrator, some sort of report of possible spillage of starch. He disappears from the surveillance cameras for about 42 seconds. Next time we find him, he is laying on the floor. He's had a grave skull injury, and he's broken several ribs. EMTs are called. One of the supervisors is there. A Rose Zollner, who's also a safety supervisor and sanitation supervisor, gets to his side. About five to 10 minutes after the call, the paramedics show up and take Mr. Lewis off to Chester Hospital, where he's first treated and taken by helicopter to St. Louis death. His death is just listed as accidental. There are three investigations into this accident. The first one was by Ms. Zollner. She started that investigation just shortly after the accident. She and a supervisor made the assumption that Mr. Lewis fell from a height. As they started the investigation, they said there was no evidence, no footprints, nothing to show he's up on an inconclusive. Mr. Lewis went out to get an independent evaluation. They had Chester Safety and Health Investigations come in and look at the same factors. He started his investigation on August 6th, so shortly after the accident. He conducted interviews. He reviewed the videotapes, reviewed all the evidence, and his evidence was inconclusive. He could not come up with a reason why Mr. Lewis fell. Then OSHA came in and started on August 15th and started their own investigation. They were looking for safety violations, trying to find the cause of the accident. They too came up like the other two investigations. They had no cause and could not find a reason for Mr. Lewis' fall. Mr. Williams, I have a question and I wasn't quite sure. I believe the decedent's former wife in the hospital noticed that he was covered with some white substance. Is that correct? Yes, she mentions this and I was going to get to that. Ms. Zolder mentioned there was some what looked like cornstarch on his face. It doesn't say she was covered, but there was some on his face. He was there for about another five to ten minutes, so if there was starch coming around, he would get more of that starch on, but there was starch there. Well, I have a question. Was there starch on the floor? I don't know that for sure. There was? There's a starch spillage. That's all we have. From what I see, it doesn't say it's on the floor. It can be slippery, as Ms. Zolder said, but she didn't. The other question I have, and I'm asking only for information since we're in the factual phase here of your argument, was it liquefied starch or was it powdered starch? From my understanding, it's powdered starch. Okay. Was there any coefficient of friction analysis done by OSHA or anyone? OSHA, the investigation, all they had was there was a possibility of starch on the floor. What we do know is Ms. Zolder did not say the floor was slick or slippery when she was there, nor did she say that in her investigation. We don't see that in any of the other two investigations. The floor was slippery or if the starch caused a problem. We just don't know. There's a problem with this. The evidence before you is that there are a lot of things we just don't know. But didn't Rose Zeldner say there's no starch guard on the belt above and that starch was falling off the roller on the belt of the dehydrator? And didn't she say there was a white substance assumed to be the starch? And that's the reason why Mr. Lurz was heading over that way, because there was a starch spillage. As we stipulated... So why is it unreasonable for the commission to assume he slipped in the starch? The starch, no one else says that the starch was slippery at that time. But starch is slippery though, isn't it? It can be slippery, as Ms. Zolder stated, but also she was at the same scene. So she's a contemporaneous witness that didn't say anything about being slick at that time. But couldn't the commission have drawn that inference? It could have been. It could have also been that he had some sort of... Well, I mean that if they draw that inference, then how do we reverse? It is one of several inferences you could make. Thank you. So the two issues before the court today is whether or not Mr. Lurz his injuries arose out of his employment. And a second one is if his son, Derek Lurz, who Mr. Coffey represents, is a dependent under Section 7C. And we say to both of those, the answers are no. We first turn to the determination that Mr. Lurz's accident injuries arose out of his employment. He bore the preponderance of evidence to prove that this did rise out of his employment. The arbitrator found a distinct risk of being near the dehydrator, but we don't know why he fell. All we can do is speculate. Do we know if he fell? Do we know if he fell? We don't know. All we know is he fell on the floor. That's right. That's all we know. That's correct. We have a diagnosis as well, or a finding of blunt force trauma or something of that effect. Do we not? Yes, we do. So we just know that he suffered these injuries, the two ribs. I don't see, there's a lot of things you could read into those items. The other thing we don't have is a lot of evidence because the time that the paramedics show up and the time he passes away on the 14th, the idea for everything was done was to preserve his life, not to preserve evidence. We believe this case is somewhat like the first cash case that we referenced earlier. In that case, the lady was going to get her something out of the bathroom, a small bathroom, a five by seven bathroom. She walked in the bathroom and fell. She doesn't know why she fell. She hurt her left arm, but she didn't have a reason why she fell. During the course of that investigation, the arbitrator, of course, awarded her, made an award to her, but as the court went further on, said, we don't know why. You could make one speculation that there was something on the floor, the floors were dirty, and you can make one that was not, that was not the cause. So the court eventually reversed the arbitrator. But here we don't have anything other than the starch that we're talking about, but no one else says it was slip. We don't see any contemporary statements from any other that they were sliding on the floor, and nor was in her investigation. Well, let me ask a question. Isn't it true that even the people that responded, no one identified anything that could have fallen and hit this man in the head? That's absolutely correct. They don't see anything. He was just found on the floor. He's found on the floor. That's it. So isn't it safe to assume from those facts that the blunt trauma was his head hitting the floor? Yes. I believe that would be a fair assumption. That's fair. All right. Thank you. Is it not assumable also a blunt force can be inflicted upon someone by somebody else? That's true. We just don't know what happened there. I'd like to turn quickly to the second point or second issue before you is whether or not Derek Lurz was independent of Leonard Lurz at the time of the accident and could receive benefits under Section 7C. And we believe that's not true, that he doesn't qualify. And the reason why is under case law, you look at Obear versus Nestor, that there has to be a present existing relationship and support coming from the person who's deceased to that person, to that dependent. We don't have that here in this case. Mr. Lurz, based on the testimony we had, we really had four people and one document that came into evidence here. The first two people who testified are going to be Patricia Stewart, who's the just said, yes, he supported my son. Leonard Lurz also made the same allegation saying that, yes, I received funds from my father and he supported me. And then they also presented this agreement between the two parties, between Leonard Lurz and Patricia Stewart about supporting Derek while he was in college. Now, that was just only for while he was in college. Let me take each one of those issues to task first. First, we have testimony from a friend and former or present co-worker that he observed the decedent giving money. That's true. We have two people, Mr. Guthrie, and we also have Mr. Guthrie and Mr. Robertson. If you get into the devil of details, you see both those people on the record, Mr. Guthrie, around page 414 of the record, you're going to see he says it was when he was 18, but doesn't say anything about after 18. And that would have been in 2005. Mr. Eric Lurz was born in 1987. He turned 18 in 2005. He was out of college by 2007. And then 2012 was when his father died when he was 25. And then also Mr. Robertson had something very similar. If you go back through the record around page 431 of the record, you're going to see that he says he really didn't know if any of these funds went to Leonard Lurz after he was out of high school. So it's looking at details of each one of those testimonies. You see that, yes, when he was in high school, he was getting this money. But after high school, we have nothing. We have no bank records. We have nothing that can support, no money orders. So this is very much... Is that sufficient? Is that necessary? We have testimony. Well, we have testimony from two people who are self-serving testimony. Well, that goes to wait, doesn't it? Pardon? That goes to wait, probably, right? Wait, but where's the support? It's self-serving. Isn't the testimony of any litigant self-serving? Say again? Isn't the testimony of any litigant self-serving? It's self-serving. That's the reason why we ask for proof. Right. But now we're asking for proof. They bring two people. And so this is very much like the current case that Mr. Lurz's attorney pointed out. It's a 370 Illinois 474. In that case, a gentleman had passed away. And his mother, who was living in Mexico, says, I'm receiving money, $15 to $20 a month from my son, and they take testimony. So the uncle of the decedent comes in and testifies. Yes, I saw them do money orders, do cash and send that to the mother. Then we find out that he really wasn't around. He was incarcerated during that time that he was testifying to. So he wasn't there. And so what we have here is we have two self-serving testimonies of people who are interested parties. Then we have these two other people who can't testify. They cannot backstop these two people, these statements. So we have nothing other after 2009 when Mr. Lurz was out of college. So we have three years of no proof. And so as Mr. has been brought up, the statute is supposed to get practical, liberal construction. But I think we are not there with the evidence that no matter how you practically construct this, besides the self-serving statements of two interested parties, we really don't have anything to show that for the last three years of his life he provided any kind of support. There's a question? I don't, any questions from the court? I don't, I kept seeing the flash. Oh, no, you're in the yellow through the intersection. Exactly. So we asked the court to reverse the commission and deny benefits because this did not arise out of the employment and that Derek Lurz is not a dependent based on the reading of 7C. Any questions from the court? No. Okay. Mr. Coffey, you may respond. May it please this honorable court, opposing counsel, my name is Jason Coffey. I represent Mr. Lurz, the dependent son of the decedent Leonard Lurz, in the affilee named in this trial court, which confirmed the decision of the commission. The decedent's primary duty at Gilston Mary Lee was to observe production in the facility and address any issues which may halt or slow production. The decedent was performing that very job duty when he was injured. The testimony in the record is undisputed that the decedent was walking to address a starch spillage falling from an overhead conveyor. The type of spillage would cause a halt in production. Mr. Coffey, I'm not sure I understand, it was on a conveyor, so it's dry starch or liquefied? Yes, it's a powdered starch. Okay, thank you. And it's our argument that the decedent's employer would have reasonably expected him to address a starch spillage such as this. The commission analyzed the testimony, the photographic and video evidence of the facility at the time, and they made the reasonable inference that my client was injured while attempting to address this starch spillage. It should be noted, as opposing counsel indicated, that they conducted several investigations, but those investigations did not and were limited to not providing any conclusions based upon reasonable inferences of fact. The scope of their investigations were limited to finding direct causes of the injury. They could not produce any answers because the decedent's fall was unwitnessed. But it was undisputed that the decedent had no preexisting health condition at the time of his fall. And further, there was no evidence of any personal health condition contributing to his fall at that time. I would point the panel to the emergency room records in which they took his temperature, body temperature, air temperature of the facility, and found nothing contributing to a fall that would have been considered a personal condition. We argue that the appellant's reliance on the first cash financial case is misplaced because the facts of that case are distinguishable from our present case. The claimant in first cash provided no theory or premise as to how the claimant fell. I mean, they freely admitted we have no idea how the claimant fell in this case. Was there, Mr. Coffey, was there a coroner's inquest? In this case, no, your honor. There was not. Okay. And there was no autopsy either. In that first cash case, when you provide no theory or premise, it left any and all inferences still on the table. The arbitrator made the inference that the floor was dirty. Well, it was just as equally possible that the floor was clean. There was nothing, no evidence put forward to imply an employment-related risk. But I would ask respectfully if the decision in first cash would be the same, if the claimant was covered in a substance after the fall, which had been seen on the floor prior to the fall, or would the decision have been different if the claimant was entering the bathroom and her job was to address a water leak onto the bathroom? That's precisely what my client was doing. He was going to address a water leak. The question was asked to opposing counsel whether or not there was a starch guard. And I just want to point out that it was very important. We were able to deduce that there was not a starch guard there based upon a work order indicating that they placed one following the incident. This was not done to prove any subsequent remedial measure. We made that stipulation on the nothing there to catch the starch. The starch was freely falling to the ground. So I wanted to point that out. Counsel, can I ask, you say in your brief that the claimant or the decision, excuse me, didn't have starch on him before the fall. Is that, did you determine that from surveillance or video? Yeah, video surveillance and a statement from his co-worker. If I may, to answer your question more fully, the video surveillance demonstrates he and a co-worker who testified who had the same job type walking away from the video surveillance. Someone indicates something's going on over there. We found out from the testimony of the co-worker that it was a starch spillage. They then separate and my client leaves the camera footage as the other party keeps going straight. 42 seconds later from him separating off the camera, he's found lying on the ground with a severe head trauma, bleeding profusely. And that is when Rose Delner said he had starch on his person. I'm not going to misquote the evidence there, but my client who was called to the emergency room noted immediately a foul odor and that he was covered in the substance and was told that was starch. Opposing counsel states that if my client's ex-wife, it could be self-serving testimony. But at that time and in that moment, I find that in that emergency moment kind of hard to believe. And if there's a challenge to that testimony, I think it should be done at trial. If you look at the cross-examination, Mr. Wilms' law firm lawyer who was there demurred, he didn't even ask about it. He didn't ask her any questions. So I do believe that that is one of those seminal circumstantial pieces of evidence that allows the inference made by the commission to be reasonable in this circumstance. Well, let me ask you a question. The sufficiency of circumstantial evidence is really based on the legitimacy of the desired result or the desired finding. And it's speculation if the non-existence of the fact inferred is just as probable as the existence of the fact inferred, then it becomes speculation. That's first cash. So the question that I have for you is, is the non-existence of an inference that he died from something other than slipping on starch as probable as the inference drawn by the commission that he did slip on starch and hit his head? Are they equally probable? Or is it more likely true than not that he slipped on starch and hit his head? Totally fair question. I believe it is more probable that he slipped on starch based on the circumstantial evidence, undisputed circumstantial evidence we have in this case. We know that there was a starch spillage. We know that it was directly overhead where he was found. We know there was no starch going. So there is nothing to prevent that starch from falling to the ground. Then follow that up with, we know he didn't have no starch on his person at the time he was found. All of those culminate into what I believe making it more probable than any other inference being made. And then those other circumstantial pieces of evidence, you know, even add to it, shortly thereafter him being found to have normal body temperature, no indications of a syncope, a heart issue, a stroke, or anything that would have caused him to lose his balance. That's why I believe it's more probable in answer to your question. And for all those reasons, we would posit that the decision regarding whether or not the decedent's injury arose out of his employment with Gilson-Mary Lee is not against the manifest way to the evidence. In that there is not another conclusion clearly apparent in the record. If I can move on and pivot to the dependency issue. Obviously, Section 7 addresses accidental injuries resulting in death and dependency. I would agree with the opposing counsel that we look to the actual time of the incident and the nature of the relationship. And I believe that is the test to be applied, the nature of relationship between my client, Mr. Derek Louris, and the decedent, his father. We believe we put forth uncontroverted evidence in the record that Derek was dependent upon his father, the decedent, for his means of living. The cost of his medicine alone would have put Derek in a significant financial, insignificant financial turmoil. We brought forth his medical records indicating, and I do apologize, I'm sorry to go off on a tangent, but I noticed two ear typos in my brief, which is unacceptable to me. But that in the years leading up to his father's passing, he was either hospitalized or diagnosed with a flare-up of his times. It's even noted in the records how he was dropped from his vocational course due to his absences brought on by his illness, all prior to his father's passing. We brought forth evidence of people who worked with or friends with, lived next to Leonard Louris, were with him, monthly giving or weekly giving to his son. I would hesitate to put forth a new goal line, so to speak, that we must have financial records in order to substantiate dependency. That has not been the law to date, as I see it, and I would urge this panel not to establish that. It's easy for those of us on the outside looking at a record to say, well, where are the financial records? When you are paid weekly and not paid a significant amount, it is nothing for these employees to go straight to, it's nothing for these employees not to even have a bank account. I believe Mr. Louris did, but it's nothing for the other employees not to, it is nothing for them to just take their check down the street in the town we live in, where this facility is, to the bank and cash their check and get it in cash. Was Derek cross-examined? Derek was cross-examined. He was asked questions and basically he was just asked, I mean, that would demonstrate these payments other than what your testimony is. He admitted he did not. Well, isn't that an issue of credibility? The commission chose to believe him when he said that he was being supported and he got, I don't know, 40 or 50 dollars a week or whatever it was. It was otherwise being supported. Section 7C only requires support in any manner. So, it's not a question of quantum. Is he being supported in any manner? If the commission believes him, isn't that enough to satisfy his burden? I believe so, yes. I would agree with that statement wholeheartedly. And the fact that there was no evidence that was contradictory to what they all stated, all the witnesses stated. I see my time is almost up, so I will answer any questions that the panel has. Otherwise, I thank you for your time and thank you for hearing us out. Any questions from the court? Hearing none, thank you, Mr. Coffey. Thank you, Your Honor. Mr. Wilms, you may reply. Your Honor, I'll try to keep this short. First off to the first issue about the starch. We have to recall that he's supposed to be addressing a starch spillage. We also have to remember that by the time he's taken to the hospital, he's been underneath that starch from the time, at least we know when he was found, for approximately 10 minutes. So, it will fall on him at that point. So, being covered, Ms. Zoellner said there was some on his face. So, the quantity may be post-accident. Next, there is a controversy about the evidence before the court that the two witnesses that they brought forth, supposedly independent, cannot backstop Mr. Derek Lures. But is it necessary if the commission believes him? The, we have to call the court, when you look at the evidence that was presented, we have a chance to check his evidence. And the two people who are supposed to know him said, we never saw it. They never saw it after he turned 18. So, I believe this is a lack of the evidence. And this, like I said earlier, I believe this is very much like that Decarron case from many years ago, where the person who was providing additional testimony wasn't even around. So, these people were not around during those, that time from the time he was 18 to the time of the accident. They can't give us anything else. So, we look at just statements. I can say that I'm a dependent of Derek Lures and make something up, and you would not believe me because I'm not related and I'm much older than him and Mr. Lures. But people can make statements, but we like to have them checked. And I believe that the arbitrator, excuse me, the commission took too much of what was said, but that was not backstopped. We have to have something other than just, I say so. And thank you for your time. Any questions for counsel? No. Okay. Counsel, thank you both for your arguments in this matter this morning. It will be taken under advisement.